IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2010 NOV 24 PM 2:22

A10CA 910LY

| | | |
|---|---|---|
| ION GEOPHYSICAL CORPORATION and | § | |
| INOVA LTD., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| AXEL MICHAEL SIGMAR, | § | |
| Defendant. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

### A. Parties

1.      Plaintiff, ION Geophysical Corporation (formerly known as Input/Output, Inc.), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 2105 CityWest Boulevard, Suite 400, Houston, Texas 77042.

2.      Plaintiff, INOVA Ltd., is a corporation organized and existing under the laws of the Cayman Islands, with its registered place of business at P.O. Box 309GT, Ugland House, South Church Street, George Town, Grand Cayman.

3.      Upon information and belief, Defendant, Axel Michael Sigmar, an individual, who is a citizen of the State of Texas, may be served with process at 5475 Lakeshore Drive, Lago Vista, Texas 78645.

### B. Jurisdiction

4.      This is a civil action to declare the rights and liabilities of the parties pursuant to an Employee Confidentiality and Patent Agreement, which provides for the assignment of inventions and/or patents. This Court has jurisdiction over the lawsuit because the action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.; see DDB Technologies, L.L.C.*

*v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008).  This Court has subject

matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## C. Venue

5.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), because Defendant

resides in this district.

## D. Conditions Precedent

6.      All conditions precedent have been performed or have occurred.

## E. Facts

7.      Plaintiffs bring this suit for declaratory judgment under Federal Rule of Civil

Procedure 57 and 28 U.S.C. §§ 2201 and 2202.

### Sigmar's Employment History with Input/Output, Inc.

8.      Defendant Sigmar was hired by Input/Output, Inc. (hereinafter "Input/Output") as

"Vice President, Corporate Development" on September 1, 1992.  (Ex. 1, News Release (Sept. 3,

1992).)   In this position, Sigmar was responsible for implementing Input/Output's corporate

development plans and strategies.   (*Id.*)   At the time Sigmar was hired, Input/Output had

designed, manufactured, and marketed seismic equipment worldwide for 24 years.  (*Id.*)

9.      On the day he was hired, Sigmar executed an Employee Confidentiality and

Patent Agreement (hereinafter "Patent Agreement"), attached as Exhibit 2 and incorporated by

reference herein.

10.      The Patent Agreement defines "Intellectual Property" as "all methods, patents,

formulae, inventions, designs, systems, processes, trade secrets, copyrights, know-how,

proprietary information, rights, trademarks, and trade names relating to any Product conceived,

developed, or established by [Input/Output], or by [Sigmar] (whether solely or jointly with

others) during the term of the [Patent] Agreement (including any renewal or extension hereof),

(i) at [Input/Output's] expense, (ii) at [Input/Output's] request, or (iii) based upon knowledge or information obtained from [Input/Output], and shall include all modifications and improvements thereof made at any time." (Ex. 2 ¶ 1(h).)

11.    The Patent Agreement further defines "Product" as "a Seismic Data Acquisition System and/or any other equipment, machine, service, or system researched, developed, conceived, manufactured, assembled, sold or distributed by [Input/Output] at any time." (*Id.* ¶ 1(f).)

12.    Pursuant to the Patent Agreement, Sigmar agreed that all Intellectual Property is the "sole property" of Input/Output. (*Id.* ¶ 2(a).)

13.    Moreover, Sigmar agreed to "execute and deliver to [Input/Output] such assignments or other documents as may be reasonably necessary to evidence or confirm the ownership of all Intellectual Property by [Input/Output]." (*Id.* ¶ 2(c).)

14.    Further, Sigmar agreed to execute any documents reasonably required by Input/Output to prosecute patents applications in the United States and/or any foreign country relating to the Intellectual Property, and to cooperate fully with Input/Output in the prosecution of such patent applications, even after Sigmar was no longer employed by Input/Output. (*Id.* ¶ 2(d).)

15.    Pursuant to his obligations under the Patent Agreement, Sigmar disclosed that he had not conceived any inventions or discoveries, patented or unpatented, within the scope of the Patent Agreement prior to his employment with Input/Output. (*See Id.* ¶ 2(e) & Ex. A.)

16.    On October 1, 1997, Sigmar was promoted to "Senior Vice President, Advanced Systems Group." (Ex. 3, News Release (Oct. 6, 1997).)

17.     On October 1, 1998, Sigmar was promoted to "President and Chief Operating Officer" of Input/Output. (Ex. 4, News Release (Aug. 13, 1998).)  Additionally, Input/Output's board of directors elected Sigmar to be a director of Input/Output.  (*Id.*)  As President and Chief Operating Officer, Sigmar was responsible for Input/Output's research and development, manufacturing, sales, marketing, and customer service functions.  (*Id.*)  In short, Sigmar was responsible to oversee Input/Output's day-to-day operations as a world leader in the seismic acquisition technology for land and marine exploration.  (*Id.*)

18.     In or around August 1999, Input/Output reorganized its management structure. (Ex. 5, News Release (Aug. 18, 1999).)  On August 17, 1999, Sigmar became "Executive Vice President and Chief Technology Officer" of Input/Output to allow him to devote significant time to the commercialization of one of Input/Output's products—the VectorSeis digital sensor.  (*Id.*) Sigmar also became "President" of I/O Technologies.  (*Id.*)  In these roles, Sigmar was responsible for defining the evolution of Input/Output's technologies and applications of those technologies to provide for the long-term growth of Input/Output. (*Id.*)

19.     On December 27, 1999, Input/Output announced that Sigmar had resigned as Executive Vice President and Chief Technology Officer of Input/Output and President of I/O Technologies, but that Sigmar would continue to service as Director on Input/Output's Board of Directors.  (Ex. 6, News Release (Dec. 27, 1999).)  Sigmar's employment as an officer and employee of Input/Output and/or any of its subsidiaries terminated on January 17, 2000. (Ex. 7, Acknowledgment, Stipulation, and Release (Jan. 27, 2000).)

20.     On May 30, 2000, Sigmar resigned his position as a Director on Input/Output's Board of Directors. (Ex. 8, Letter from A. Sigmar to J. Lapeyre (May 30, 2000).)

**Patent Prosecution History of U.S. Patent No. 7,152,473**

21.    On March 17, 2000, International Patent Application No. PCT/US00/07310 ("PCT Application") was filed on behalf of the inventors and Input/Output.  (Ex. 9, WO 00/55577 (published Sept. 21, 2000).)  The PCT Application claimed priority to Provision Patent Application No. 60/125,076, filed on March 17, 1999.  (*Id.*)  The PCT Application, entitled "Integrated and Multi-Axis Sensor Assembly and Packaging," identified 20 inventors, one of whom was Defendant, Sigmar.  (*Id.*)  All of the named inventors were past or present employees of Input/Output.

22.    On September 12, 2001, U.S. Patent Application No. 09/936,634 ("the '634 Application"), which was based upon the PCT Application, was filed in the United States Patent and Trademark Office ("USPTO").  (Ex. 10, Transmittal Letter to the USPTO (Sept. 12, 2001).)

23.    On November 5, 2001, the USPTO notified Input/Output that an oath or declaration of each of the named inventors was required to prosecute the '634 Application, pursuant to 35 U.S.C. § 371 and 37 C.F.R. 1.497, or else the '634 Application would be considered abandoned. (Ex. 11, Notice of Missing Requirements (Nov. 5, 2001).)

24.    Input/Output sent the '634 Application to each of the 20 named inventors.  (Ex. 12, Petition in Support of Application Filed Under 37 C.F.R. § 1.47(a) and Fees Under 37 C.F.R. § 1.17(h), at 2 (June 4, 2002).)  Defendant Sigmar received a copy the '634 Application and a declaration on or about March 12, 2002, by certified mail.  (*Id.*)  In response, Input/Output's received executed declarations from each of the inventors, except Defendant Sigmar.  (*Id.*) Further, each of the inventors, except Defendant Sigmar, assigned their rights to the inventions disclosed in the '634 Application to Input/Output.  (*See* Ex. 13, Assignment, filed at Reel 012981, Frame 0746–766, recorded Jun. 11, 2002.)

25.     Sometime between March 12, 2002 and April 9, 2002, Sigmar agreed to review the '634 Application and execute the declaration only after being paid a consulting fee.  (Ex. 12, at 2.)  After Input/Output sent Sigmar an IRS Form W-9, so that the consulting fees could be sent to Sigmar, no response was received.  (*Id.* at 2–3.)

26.     On June 4, 2002, Input/Output filed a response to the Notice of Missing Requirements.  (*Id.* at 3)  The response included the declarations executed by the 19 inventors and a petition under 37 C.F.R. 1.47(a) seeking acceptance of the '634 Application without the declaration of the remaining inventor, Defendant Sigmar.  (*Id.*)

27.     On September 6, 2002, the USPTO dismissed the petition, because, *inter alia*, Input/Output had not provided sufficient evidence that Sigmar had refused to sign the oath or declaration.  (Ex. 14, Decision on Petition Under 37 C.F.R. 1.47(a), at 2–3 (Sept. 6, 2002).)

28.     On October 21, 2002, Input/Output contacted Sigmar about his unwillingness to sign the declaration.  (Ex. 15, Petition in Support of Application Filed Under 37 C.F.R. § 1.47(a), at 2 (Dec. 6, 2002).)  Sigmar reiterated his earlier position that he would review the '634 Application at an hourly rate of $450.00.  (*Id.*)  However, Sigmar refused to provide an estimate of how long the review would take.  (*Id.*)  Moreover, Sigmar insisted that Input/Output "could prosecute the application without him."  (*Id.*)

29.     Later on October 21, 2002, Input/Output offered to pay Sigmar consulting fees of $100 per hour for four hours to review the '634 Application, sign the declaration, and execute an assignment of the inventions disclosed in the '634 Application to Input/Output.  (*Id.* at 2 & Ex. A.)

30.    On October 22, 2002, Sigmar refused the offer and again demanded at least $360 per hour and a minimum two-day commitment to review the '634 Application, so that Sigmar could be in a position to decide whether he would sign the documents. (*Id.* at 2 & Ex. B.)

31.    On November 1, 2002, Input/Output informed Sigmar that "we are unable to reach an agreement regarding your compensation for reviewing the applications for the purpose of signing the declarations." (*Id.* at 3 & Ex. C.) Input/Output further resent the '634 Application and the declaration to Sigmar to provide him with "the opportunity to join in the application." (*Id.*)

32.    On December 6, 2002, Input/Output filed a renewed petition under 37 C.F.R. 1.47(a) to prosecute the '634 Application, which specifically included evidence of Sigmar's refusal to sign the declaration. (*Id.* at 2–3.)

33.    On April 23, 2003, the USPTO notified Input/Output's patent attorney that it had been provided with sufficient evidence to show that Sigmar had refused to execute the declaration:

> The materials submitted with the renewed petition (relating to additional efforts made by applicants to obtain the signature of the nonsigning inventor after the previous decision), taken in combination with the previous petition, provide adequate evidence that the nonsigning inventor has refused to sign the application papers after being provided with copy of the application. The renewed petition also contains an express statement of the nonsigning inventor's last known address. Accordingly, item (2) and item (4) of the requirements of a grantable petition under 37 C.F.R. 1.47(a), as set forth in the 06 September 2002 decision, have now been satisfied.

(Ex. 16, Decision on Renewed Petition Under 37 C.F.R. 1.47(a), at 1 (Apr. 23, 2003); *see also* Ex. 17, Second Renewed Petition Under 37 C.F.R. § 1.47(a), at 1 (Jun. 23, 2003).)

34.    On September 16, 2003, the USPTO granted Input/Output's petition under 37 C.F.R. 1.47(a) to prosecute the '634 Application without the signature of Sigmar. (Ex. 18, Decision on Petitions Under 37 C.F.R. 1.182 and 37 C.F.R. 1.47(a), at 2 (Sept. 16 2003).) Thus,

the declaration, which had been filed on June 4, 2002 and signed by all of the inventors except Sigmar, was accepted by the USPTO, and prosecution of the '634 Application was allowed to proceed in the USPTO. (*Id.*)

35.   Also on September 16, 2003, the USPTO notified Sigmar of the filing of the '634 Application and of his right to join in prosecution. (*Id.* at 3.)

36.   At no time during the prosecution of the '634 Application did Sigmar execute the declaration, as required under the Patent Agreement. (Ex. 2 ¶ 2(d).)

37.   The USPTO examined the '634 Application and allowed it to issue as U.S. Patent No. 7,152, 473 ("the '473 Patent") on December 26, 2006. (Ex. 19, U.S. Patent No. 7,152,473 (issued Dec. 26, 2006).) Sigmar is one of the 20 named inventors on the '634 Patent. (*Id.* at [75].)

38.   The invention disclosed in the PCT Application has further issued as European Patent No. EP1192419B1 (Ex. 20, European Patent No. EP1192419B1 (issued Apr. 18, 2007)), German Patent No. DE60034451T2 (Ex. 21, German Patent No. DE60034451T2 (issued Aug. 30, 2007)), and Canadian Patent No. CA2366999 (Ex. 22, Canadian Patent No. CA2366999 (issued Jan. 6, 2009)).

39.   At no time has Defendant Sigmar executed and delivered to Input/Output an assignment to evidence or confirm Input/Output's ownership of the rights to the inventions disclosed in Provision Patent Application No. 60/125,076, the PCT Application, the '634 Application, the '473 Patent and/or any corresponding foreign patent, as required under the Patent Agreement. (Ex. 2 ¶ 2(c).)

40.     On September 21, 2007, Input/Output changed its name to ION Geophysical Corporation.  (Ex. 23, Change of Name, filed at Reel 019943, Frame 0393–395, recorded Oct. 11, 2007.)

41.     On August 5, 2010, Plaintiff ION Geophysical assigned its rights to the '473 Patent, including any provisional, non-provisional, continuation, continuation-in-part, divisional, international, foreign, regional, and conventional patent applications corresponding thereto, and further including any and all U.S. and foreign patents that may or have granted thereto, to Plaintiff INOVA Ltd (hereinafter "INOVA").  (*See* Ex. 24, Assignment, filed at Reel 024794, Frame 0557–559, recorded Aug. 06, 2010.)

### F.  Count 1 – Declaratory Judgment that Sigmar's Inventions were Automatically Assigned to Input/Output Pursuant to the Patent Agreement

42.     Plaintiffs request this Court to declare that the inventions disclosed in Provisional Patent Application No. 60/125,076, the PCT Application, the '634 Application, the '473 Patent and/or any corresponding foreign patents were automatically assigned to Plaintiff ION Geophysical, pursuant to the Patent Agreement executed by Sigmar on September 1, 1992. Since ION Geophysical assigned all of its interest in the inventions to Plaintiff INOVA, Plaintiffs further request this Court to declare that ION Geophysical assigned and INOVA now owns 100% of the inventions disclosed in Provision Patent Application No. 60/125,076, the PCT Application, the '634 Application, the '473 Patent and/or any corresponding foreign patents.

43.     The '473 Patent identifies Input/Output as the assignee of the patent.  (Ex. 19, at [73].)

44.     The fact that 19 of the 20 listed inventors assigned the inventions disclosed in the '473 Patent to Input/Output is a matter of public record.  (*See* Ex. 13, Assignment.)

45.     However, the '473 Patent states that the patent application was filed under 37 C.F.R. 1.47, which indicates that one or more of the inventors either refused to sign or could not be reached during prosecution of the '634 Application.  (*See* Ex. 19, at [22]; *see also* 37 C.F.R. 1.47.)

46.     Further, Sigmar failed to execute an assignment to confirm Input/Output's ownership of the inventions disclosed in the '473 Patent. Thus, no public record presently exists that evidences Sigmar's assignment of the inventions disclosed in the '473 Patent to Input/Output.

47.     As a result, the public record is unclear as to whether ION Geophysical conveyed full title to the inventions disclosed in the '473 Patent to INOVA or whether Sigmar presently owns 5% (1/20th) of inventions disclosed in the '473 Patent.

48.     Declaratory relief is necessary to create a public record declaring that Sigmar conveyed the inventions disclosed in the '473 Patent to Input/Output, pursuant to the Patent Agreement.

### G.  Count 2 – Declaratory Judgment that Sigmar Holds Legal Title to the Inventions in a Constructive Trust on Behalf of INOVA

49.     In the alternative, Plaintiffs request this Court to declare that the inventions disclosed in Provisional Patent Application No. 60/125,076, the PCT Application, the '634 Application, the '473 Patent and/or any corresponding foreign patents are held by Sigmar in a constructive trust on behalf of Plaintiff INOVA.

50.     Pursuant to the Patent Agreement, Sigmar had a contractual duty to assign all intellectual property, including inventions and patents, relating to Input/Output's business that he invented while employed by Input Output. (Ex. 2 ¶ 2(c).)

51.     Moreover, as an officer and director of Input/Output, Sigmar had a fiduciary duty

to assign all intellectual property, including inventions and patents, relating to Input/Output's

business that he invented while employed by Input Output. *Davis v. Alwac Int'l, Inc.*, 369

S.W.2d 797, 802 (Tex. Civ. App.—Beaumont 1963, writ ref'd n.r.e.) (corporate officer and

director who was named as co-inventor on patent application had fiduciary duty to assign patent

to corporation because the invention was related to the business and was developed while he

occupied a fiduciary position with the corporation) (citing *Dowse v. Federal Rubber Co.*, 254 F.

308 (N.D. Ill. 1918); *Preis v. Eversharp, Inc.*, 154 F. Supp. 98 (E.D.N.Y. 1957)).

52.     Since no public record presently exists that evidences Sigmar's assignment of the

inventions disclosed in the '473 Patent to Input/Output, Plaintiffs seek a declaration that any

interest in the inventions disclosed in the '473 Patent is held in constructive trust for the benefit

of INOVA.

53.     Declaratory relief is necessary to create a public record declaring that any interest

that Sigmar claims in the inventions disclosed in the '473 Patent is held in a constructive for the

present assignee, INOVA.

## H. Request for Preliminary Injunction

54.     Plaintiffs seek to enjoin Defendant Sigmar from licensing and/or assigning the

inventions disclosed in the '473 Patent, the '473 Patent, and/or any corresponding foreign patents

to any third party during the pendency of this lawsuit.

55.     There is a substantial likelihood that Plaintiffs will prevail on the merits. The law

is well-established that inventions relating to a company's business that are developed by an

officer or director of the company must be assigned to the company for its benefit. *Davis*, 369

S.W.2d at 802; *see also Lacy v. Rotating Prod. Sys. Inc.*, 96 P.2d 1144 (Colo. Ct. App. 1998);

*Kennedy v. Wright*, 676 F. Supp. 888, 892 (C.D. Ill. 1988) (citations omitted); *Great Lakes Press*

*Corp. v. Froom*, 695 F. Supp. 1440, 1446–49 (W.D.N.Y. 1987).  Additionally, Sigmar executed the Patent Agreement, which acknowledged that inventions relating to Input/Output that were developed by Sigmar while employed by Input/Output were the property of Input/Output.  (Ex. 2 ¶ 2(a).)  Thus, there is no issue of *whether* the inventions disclosed in the '473 Patent were the property of Input/Output.  Rather the focus of this lawsuit is to obtain an order to show proper ownership in the public record.

56.    If the Court does not grant a preliminary injunction, Defendant Sigmar may attempt to license and/or assign the inventions disclosed in the '473 Patent, the '473 Patent, and/or any corresponding foreign patents to third parties during the pendency of this lawsuit.

57.    Plaintiffs will suffer irreparable injury if the Court does not enjoin Defendant Sigmar from licensing and/or assigning the inventions disclosed in the '473 Patent, the '473 Patent, and/or any corresponding foreign patents during the pendency of this lawsuit.

58.    Defendant Sigmar will not suffer undue hardship or loss as a result of the issuance of a preliminary injunction.  Defendant Sigmar has no right to license and/or attempt to assign the inventions disclosed in the '473 Patent, the '473 Patent, and/or any corresponding foreign patents.

59.    Issuance of a preliminary injunction would not adversely affect the public interest.  This lawsuit is brought to declare the proper owners of the inventions disclosed in the '473 Patent, the '473 Patent, and/or any corresponding foreign patents.  Accordingly, the public interest would be adversely affected if Defendant Sigmar were allowed to license and/or assign his interest, if any, in the inventions disclosed in the '473 Patent, the '473 Patent, and/or any corresponding foreign patents to third parties, before this Court declares the rightful owners.

60.     Plaintiffs request this Court to set this request for preliminary injunction for hearing at the earliest possible time and, after hearing the request, to issue a preliminary injunction against Defendant Sigmar.

## I. Prayer

61.     For these reasons, Plaintiffs request a judgment against Defendant for the following:

a.     A declaratory judgment that Sigmar automatically conveyed the inventions disclosed in the '473 Patent to Input/Output, pursuant to the Patent Agreement and that 100% of the inventions disclosed in the '473 Patent was subsequently assigned to INOVA;

b.     In the alternative, a declaratory judgment that Sigmar holds his interest in the inventions disclosed in the '473 Patent in a constructive trust on behalf of Plaintiff INOVA, who is the equitable owner of the inventions disclosed in the '473 Patent;

c.     Defendant be ordered to assign his interest in the inventions disclosed in the '473 Patent to INOVA.

d.     Defendant be enjoined from licensing and/or assigning his interests, if any, in the inventions disclosed in the '473 Patent, the '473 Patent, and/or any corresponding foreign patents to any third party during the pendency of this lawsuit.

e.     Reasonable attorneys' fees;

f.     Costs of court;

g.     All other relief, at law and in equity, which his Court deems appropriate.

Respectfully submitted,

/s/ James N. Willi

James N. Willi
Texas State Bar No. 00795719
Tracy J. Willi
Texas State Bar No. 00784633
WILLI LAW FIRM, P.C.
9600 Escarpment Blvd., Ste. 745, PMB 34
Austin, TX 78749-1983
Tel. (512) 288-3200
Fax (512) 288-3202

ATTORNEYS FOR PLAINTIFFS,
ION GEOPHYSICAL CORPORATION AND
INOVA LTD

14